THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| JEFFREY HEIL and PAULA HEIL, ) | |
| ) | Case No. 2:07CV00598 DS |
| Plaintiffs, ) | |
| ) | |
| vs. ) | MEMORANDUM DECISION |
| ) | |
| STATE BANK OF SOUTHERN UTAH, ) | |
| ) | |
| Defendant. ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This matter is before the court on Defendant State Bank of Southern Utah's Motion to Dismiss Plaintiffs' Amended Complaint Under Rule 12(b)(6), and Alternatively, for Summary Judgment under Rule 56 and Related Relief (Docket No. 19), filed on October 26, 2007. In an Order dated January 27, 2009, this court already imposed Rule 11 sanctions against the Plaintiffs' attorneys, dismissed the plaintiffs' first and second claims for relief against Defendant State Bank of Southern Utah, and dismissed all claims against Defendant Iron County. Barricading

**I. Background**

The remaining claims in this case relate to a series of loans made by the State Bank of Southern Utah (the "Bank") to Jeffrey and Paula Heil (the "Heils") and entities owned or controlled by the Heils. In April of 1994, the Heils purchased 300 acres of property and 895 acre feet of appurtenant water rights near Parowan, Utah. Beginning in 1995, the Heils and entities controlled by them entered into a series of promissory notes in exchange for financing with the Bank, most of which were secured with personal property and crops owned by the Heils. On April 21, 1998, the Heils also executed a Promissory Note ("State Bank Promissory Note") in the

principal amount of $152,367.00 and a Deed of Trust ("State Bank Trust Deed") conveying to the Bank a security interest in their real property and water rights as security for the payments of the Promissory Note. As additional collateral to secure the State Bank Promissory Note, the Heils granted to the Bank a junior lien on the Heils' home in Pioneertown, California (the "California Property").

The Heils eventually defaulted on the Promissory Notes and the Bank filed a complaint ("State Court Litigation") in a Utah District Court on October 16, 2001, against the Heils, Heil Properties, LLC ("Heil Properties"), JPH Trucking, Inc. ("JPH"), and Heil Farms, Inc. The complaint sought judgment on the defaulted Promissory Notes except the State Bank Promissory Note, which was secured by the Heils' real property and water rights and would be foreclosed non-judicially.

Beginning on October 31, 2001, the Heils filed a series of failed bankruptcy petitions to stay the Bank from foreclosing on its collateral. The Heils' first three petitions were dismissed on January 3, 2002; August 21, 2002; and September 4, 2003. During this period, the Bank agreed to a stay on the State Court Litigation for 12 months or until the bankruptcy stay was removed by the Bankruptcy Court. One month after the Bankruptcy Court dismissed the Heils' third petition, the Bank sought and obtained a Default Judgment against the Heils, Heil Properties and JPH in the State Court Litigation on October 6, 2003. The Default Judgment was amended on October 28, 2003, and a Notice of Entry of [the amended] Default Judgment was served on the Heils.

On October 30, 2003, the Heils filed their fourth bankruptcy petition under Chapter 11. Following a dispute in Bankruptcy Court over the Bank's security interest in the Heils' water rights, the Bank and the Heils reached a settlement in late July of 2004 and executed a Stipulation to Compromise and Settlement (the "Compromise and Settlement"). The terms of this agreement

2

provide, *inter alia*, that: (a) the Bank and Heils agreed that the State Bank Trust Deed included a security interest in the Heil's water rights; (b) the Bank could foreclose on its interest in the water rights under the State Bank Trust Deed provided that the Heils' debts to the Bank were not fully paid by November 30, 2004; (c) the Heils could sell the real property and water rights and other collateral pledged to the Bank to a third-party provided there were sufficient sale proceeds from such sale to pay the Bank the full indebtedness owed on or before November 30, 2004; (d) the Bank could proceed with the scheduling of the foreclosure sale of all collateral; (e) the Bank agreed to either have the trust deed recorded against the Heils' California Property released, or in the alternative, to give the Heils a release of trust deed "or other document as the [Heils] may request which will operate to release the junior trust deed which State Bank holds against the [Heils'] California [Property];" and (f) the Heils released and waived any and all other claims, rights and causes of action against the Bank, its officers, agents and assigns. The Bankruptcy Court approved the Compromise and Settlement on October 1, 2004.

In mid-October, 2004, the Bank received an unsolicited offer from an individual named Raffi Cohen to purchase the Heils' Promissory Notes. The Heils' counsel sent a letter to the Bank confirming that the Heils had no objection to the Bank negotiating with Mr. Cohen, but no agreement was ever reached.

On November 24, 2004, the Bank's counsel telefaxed a letter to the Heils' counsel confirming that the Bank would voluntarily forbear from taking possession of the collateral securing the Promissory Notes until December 15, 2004, to provide additional time to seek out a third party willing to purchase the Promissory notes on a non-recourse basis. The letter also indicated that, notwithstanding the Bank's decision to temporarily forbear, it would proceed to notice and advertise all or part of its collateral for sale in compliance with Utah law on December

3

1, 2004 so that the Bank could proceed with the foreclosure by the end of the year in the event of nonpayment by December 15, 2004. On December 2, 2004, the Bank recorded a Notice of Trustee's Sale advertising the sale of the Heils' real property and water rights for December 30, 2004.

After obtaining approval from the Bankruptcy Court, the Heils and the Bank executed a "Promissory Note Purchase Agreement" on December 19, 2004, pursuant to which the Heils agreed to pay $1 million for the Bank's Promissory Notes. The Promissory Note Purchase Agreement provided that the sale was being made without recourse or warranty, and that upon full payment by the Heils, the Bank would deliver, *inter alia*: (a) the Promissory Notes, endorsed without recourse by the Bank to the Heils or its order; (b) copies of the security agreements; (c) copies of the commercial guaranty agreements; and (d) an original satisfaction of the judgment taken by the Bank against the Heils in the State Court Litigation.

Pursuant to the Compromise and Settlement, and upon the request of the Heils' attorney, the Bank allowed the Heils to take an assignment of the trust deed on the California Property by preparing and delivering an assignment of the California trust deed to Valley Title Insurance Agency ("Valley Title") on December 30, 2004. Beginning that same day, and continuing into the first week of January, 2005, the Bank also delivered all of the requested documents in the Promissory Note Purchase Agreement to Valley Title, and filed a Satisfaction of Judgment covering the Amended Default Judgment in the State Court Litigation on January 3, 2005.

On January 4, 2005, the Heils delivered the agreed upon purchase payment, and pursuant to its regular credit reporting practices, the Bank reported to Experian and TransUnion that four of the Promissory Notes (identified by loan nos. 549881, 551507, 556787 and 568709) had been paid and closed. In addition to these four loans made to the Heils personally, the Bank made four other loans

4

to companies owned or controlled by the Heils (identified by loans nos. 555524, 558882, 567123, and 921333). The Bank assigned all eight Promissory Notes to the Heils, but did not report the latter four to credit reporting agencies because they were made to business entities rather than the Heils individually. On January 12, 2005, the Bank also filed a Stipulated Motion to Dismiss the State Court Litigation with prejudice, and the court entered an Order of Dismissal with Prejudice on January 19, 2005.

Nearly two years later, on December 8, 2006, the Bank's counsel received a letter from the Heils' counsel asserting, *inter alia*, (1) the Bank failed to properly report that the Promissory Notes had been paid to the credit reporting agencies; and (2) the Allonges executed by the Bank and delivered in connection with each of the Promissory Notes were defective because they were not notarized or prepared on the Bank's stationary. After receiving the letter, the Bank researched its reporting system to the credit reporting agencies and found that, although it had reported the four Promissory Notes as paid within a week after closing, the credit reporting agencies did not reflect loan No. 568709 as being paid and closed. Accordingly, the Bank sent a manual report directly to Experian, TransUnion, and Equifax (all three major credit reporting agencies) on December 21, 2006, requesting that the error be corrected.

The Bank also contacted Valley Title regarding the delivery and validity of the Allonges to the Promissory Notes. Valley Title responded with a letter dated December 29, 2006, confirming that it received all of the documents reflected in the Document Delivery Receipt, and that it was not customary to notarize Allonges because they are not recorded. This information was shared with the Heils' counsel. Notwithstanding the view of the Bank and Valley Title, the Heils' counsel remained unsatisfied. The Bank thus prepared, executed, and delivered to the Heils' counsel nine verifications to the Allonges identifying the relevant Promissory Notes and verifying the execution

of the Allonges that endorsed the Promissory Note to the Heils. On June 21, 2007, the Heils' counsel stated that the nine verifications were unacceptable. On or about July 12, 2007, the Bank informed the Heils' counsel that if the nine verification letters were insufficient for the Heils' needs, the Bank was willing to execute new allonges for the nine Promissory Notes provided the Bank could attach the new allonges directly to the original Promissory Notes and remove and destroy the old Allonges. The Heils made no response to the offer.

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999). The court views all facts in the light most favorable to the non-moving party and draws all reasonable inferences from the record in the non-movant's favor. *Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008).

## III. The Heils' Third, Fourth, and Fifth Claims for Relief

The Heils allege in their third, fourth, and fifth causes of action in the Amended Complaint that the Bank breached the Compromise and Settlement Agreement, breached an implied covenant of good faith and fair dealing, and disparaged the Heils' credit by: (1) improperly taking a default judgment in the State Court Litigation; (2) improperly recording a notice of trustee's sale in December of 2004; (3) not releasing the lien against the California property until May of 2005; (4) improperly engaging in negotiations with Raffi Cohen; (5) filing derogatory credit reports against the Heils in November of 2004; (6) failing to notify the credit reporting agencies that the Promissory Notes has been paid following the closing of the Promissory Note Purchase

Agreement; and (7) delivering defective Allonges to the Promissory Notes because they were not notarized.

### 1. Default Judgment in the State Court Litigation

The Heils claim that the Bank improperly sought and obtained a Default Judgment in the State Court Litigation in October of 2003 because the status of the record showed that the case had been continued until March 15, 2004. The Heils assert that they had no knowledge of the Default Judgment until October 30, 2003, at which point the Heils had filed their fourth bankruptcy petition staying all further activity in the state courts, and that the Bank's counsel had a duty to inform the Heils and their counsel of its intent to obtain a Default Judgment.

The Bank filed its original complaint in the State Court Litigation on October 16, 2001. In response to the state court's order to show cause on a motion to dismiss the State Court Litigation— in the midst of the Heils' bankruptcy application—the Bank requested a stay on the matter for 12 months or until the bankruptcy stay was removed. The Heils were thus on notice that the Bank would proceed with the State Court Litigation if and when their bankruptcy petition was dismissed. After the Heils' bankruptcy petition was dismissed on September 4, 2003, however, the Heils took no action to file an answer to the Bank's complaint even though they were represented by attorneys who were on notice that the State Court Litigation would proceed once the bankruptcy stay was lifted. Accordingly, on October 6, 2003, one month after the Heils' bankruptcy petition was dismissed, the Bank obtained a Default Judgment pursuant to Rule 55 of the Utah Rules of Civil Procedure. Nothing in Rule 55 requires a party to serve notice on another party who has been validly served with the complaint that it will be taking default judgment. In addition, the automatic stay under 11 U.S.C. § 362 applies to actions *against* the debtor rather than actions *by* the debtor. Thus, the Heils could have taken action to set aside the Default Judgment or, if necessary,

7

requested relief from the automatic stay from the Bankruptcy Court. In any event, the Bank properly obtained the Default Judgment in the State Court Litigation.

### 2. Notice of Trustee's Sale

The Heils allege further that the Bank breached the Compromise and Settlement Agreement by recording a Notice of Trustee's Sale of the Heils' real property and water rights on December 2, 2004. The Compromise and Settlement, however, expressly provided that the Bank could complete the foreclosure of its collateral if the Heils had not paid in full by November 30, 2004. The Heils do not dispute that the Bank had not been paid on or before November 30, 2004. Notwithstanding the November 30 deadline, the Bank *volunteered* to forbear from taking possession of the collateral securing the post-due Promissory Notes for a brief period of time to find a third party purchaser. This was not an amendment to the agreement; indeed, the bank made it clear that this voluntary act was "not part of any contract, agreement, representation or understanding made between the Bank and the [Heils]." The Heils' contention that the Bank's action constituted a "modification" to the Compromise and Settlement is thus groundless, and did not require ratification by the Heils. Furthermore, the Bank clearly reserved the right in the letter indicating its voluntary forbearance to proceed to notice and advertise all or part of its collateral for sale in compliance with Utah law on December 1, 2004.

### 3. Release of the Heils' California Property

The Heils claim that the Bank failed to release the trust deed on the Heils' California Property as provided for in the Compromise and Settlement. Although the Compromise and Settlement was approved by the Bankruptcy Court on October 1, 2004, the Heils allege that the Bank did not properly release the California Property until May of 2005, thereby delaying their efforts to refinance the home and obtain money to service their debts. The Bank claims, however,

that the Heils' counsel asked the Bank to assign the trust deed on the California property—rather than immediately reconveying it—to protect the home from the Heils' unsecured creditors in the bankruptcy proceedings. In any event, the Heils do not dispute that the Bank executed and assigned the California trust deed and delivered it to Valley Title on December 30, 2004. After delivering the assignment to Valley Title, the Bank was not responsible for the delay in its recording.

### 4. The Bank's Negotiations with Raffi Cohen

The Heils also allege that the Bank violated "the letter and the spirit" of the Compromise and Settlement Agreement by negotiating directly with Raffi Cohen, a prospective buyer of the Heils' Promissory Notes. The Compromise and Settlement, however, does not preclude the Bank from selling its interest in the Promissory Notes to a third party. Significantly, the Heils admit to sending a letter to the Bank confirming that they had no objection to the Bank negotiating with Mr. Cohen, though the Heils dispute whether the letter gave consent to negotiate the sale of the Promissory Notes or the Heils' property. Since the Bank did not own the collateral securing the Promissory Notes, it assumed the Heils consented to negotiations regarding the Promissory Notes. In addition, the Heils cannot claim to have been precluded from negotiating with Mr. Cohen because they admit to such negotiations in September of 2004. Ultimately, because the Compromise and Settlement did not preclude the Bank from selling its interest in the Promissory Notes, the Bank did not violate any fiduciary duties or contractual obligations by negotiating with Mr. Cohen.

### 5. Disparagement of the Heils' Credit

The Heils next allege that the Bank violated the implied covenant of good faith and fair dealing relating to the Compromise and Settlement by filing derogatory credit reports in November of 2004 to undermine the Heils' efforts to sell or refinance their assets to pay off the Bank. Nothing

9

in the Compromise and Settlement, however, precluded the Bank from filing credit reports pursuant to their normal banking practices. Moreover, the Heils dispute neither the fact that they were in breach of the Promissory Notes in November of 2004, nor the accuracy of the information reported by the Bank to the credit agencies. As the Bank urges, failing to accurately report the status of the pertinent Promissory Notes would have disadvantaged other potential lenders relying on the information provided by credit rating agencies. Thus, the Bank's reporting of the Heils' default on the Promissory Notes to credit agencies, pursuant to the Bank's standard reporting practices, did not violate any implied covenant of good faith and fair dealing relating to the Compromise and Settlement.

### 6. Reporting of the Promissory Note Payments to Credit Rating Agencies

The Heils further allege that the Bank failed to properly report that the Promissory Notes had been paid to the credit reporting agencies. The Heils do not dispute, however, that on January 4, 2005, the Bank reported to Experian and TransUnion that four of the Promissory Notes (identified by loan nos. 549881, 551507, 556787 and 568709) had been paid and closed. Once the Bank accurately reported this information, it had no control over, and was not responsible for, the manner in which the agencies handled this information. After the Heils notified the Bank on December 8, 2006, that their payment of the Promissory Notes was not accurately reflected by the credit agencies, the Bank researched the problem and discovered an inaccuracy regarding Loan No. 568709. Even though the Bank accurately reported this payment a week after closing, it sent a manual report directly to Experian, TransUnion, and Equifax (all three major credit reporting agencies) on December 21, 2006, requesting that the error be corrected. Ultimately, the Heils have not demonstrated that the Bank failed to properly report the Promissory Note payments in 2005.

### 7. Allonges to the Promissory Notes

Finally, though the Heils argue that they could not obtain financing because lenders would not recognize the Bank's unnotarized Allonges to the Promissory Notes, they have not refuted the Bank's and Valley Title's explanation that notarization is not required for such documents. They also never responded to the Bank's offer to complete new Allonges to replace those attached to the original Promissory Notes. This issue is presumptively moot.

## IV. The Heils' Sixth and Seventh Claims for Relief

In their sixth and seventh causes of action, the Heils assert claims for interference with contract and interference with prospective economic relations based on the Bank's alleged warning "not to deal with the Heils" to a prospective buyer of the Heils' property. To demonstrate tortuous interference, a plaintiff must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Atkin, Wright & Miles v. Mountain States Telephone & Telegraph Co.*, 709 P.2d 330, 334-35 (Utah 1985). The improper means requirement "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules." *Leigh Furniture v. Isom*, 657 P.2d 293, 308 (Utah 1982). Alternatively, the Heils could demonstrate improper purpose if the Bank's "predominant purpose was to injure [them]." *Id.* at 307. Under the improper purpose standard, the Heils would have to prove the Bank acted to injure them "merely for the sake of injury alone" as "an end in itself," rather than to advance the Bank's long-term economic interest. *Id.* at 308. For this reason, Utah courts have indicated that the improper purpose standard will rarely be satisfied in commercial contexts. *Id.* at 307.

In May of 2006, the Heils entered into a real estate purchase contract with VRB, an investment company owned by Wade and Mark Wilcock (the "Wilcocks"), for the sale of the

11

Heils' property. The contract used by VRB provided a right to cancellation "if [the] Buyer determines that the results of Buyer's Due Diligence are unacceptable . . . ." Sometime after executing the purchase contract and performing its due diligence, VRB determined that it was no longer interested in purchasing the Heils' property.

The Heils claim that the Bank's undertook two actions to cause VRB to cancel its purchase contract. First, relying on an affidavit from Steve Baden, the Heils assert that the Bank warned the Wilcocks "not to deal with the Heils." The Wilcocks, however, testified under oath that they were never told by the Bank "not to deal with the Heils," and that the Bank had nothing to do with VRB's decision to cancel the real estate purchase contract. Furthermore, even if the Bank made such a statement to the Wilcocks, the Heils have not demonstrated that the statement was made for an improper purpose or by improper means. Indeed, because the Bank had been through multiple lawsuits and four bankruptcies with the Heils, such a statement cannot be said to be defamatory.

The Heils also assert that VRB's decision to cancel the contract was based on the Bank's denial of VRB's loan application for the purchase of the Heils' property. The purchase contract does not, however, condition final approval of the agreement upon VRB's procurement of financing. Moreover, VRB never made a loan application with the Bank, and even if the Bank had denied such an application, VRB could have sought financing from different lenders. Because the Heils do not dispute the Wilcocks' testimony that the Bank's actions had no bearing on VRB's decision to cancel the contract, there is no legal basis to support the allegations that the Bank illegally interfered with the real estate purchase contract between VRB and the Heils.

## V.  The Heils' Eighth Cause of Action

The Heils' final slander of title claim is, by their own admission, directly tied to whether the Bank improperly claimed a security interest in the Heils' water rights. As this court already

12

recognized in an Order dated January 27, 2009, the parties agreed in the Compromise and Settlement signed and entered by the Bankruptcy Court on October 1, 2004, that the Bank had a valid security interest in the Heils' water rights, and that the Heils would release and waive any and all other claims, rights and causes of action against the Bank. For these and other reasons, the January 27 Order dismissed the Heils' first and second claims, and imposed Rule 11 sanctions on the Heils' attorneys for filing unwarranted claims of fraud and abuse of process against the Bank. In addition to the clear terms of the Compromise and Settlement, the binding orders of this court and the Bankruptcy Court bar the Heils' from asserting a slander of title claim against the Bank pursuant to the doctrines of *res judicata* and/or *collateral estoppel.*

## VI. Conclusion

Accordingly, for the reasons stated and other good cause shown, the court hereby grants Defendant's Motion for Summary Judgment (Docket No. 19). The clerk of the court is hereby directed to enter judgment for the defendant State Bank of Southern Utah and close the case.

SO ORDERED.

DATED this 31st day of March, 2009.

BY THE COURT:

_/s/ David Sam_
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

13

14